UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FPS INVESTMENTS, LLC,           )
                                )
          Plaintiff,            )
                                )
     vs.                        )          Case No. 4:07-CV-1303 (JCH)
                                )
AZTECA MILLING L.P., et al.,    )
                                )
          Defendants.           )

## MEMORANDUM AND ORDER

The matter is before the Court on Plaintiff's Claim Construction Brief (Doc. No. 28), filed

January 18, 2008. The matter is fully briefed, and a claim construction hearing was held on March

31, 2008.

## DISCUSSION

### I.     US Patent No.  6,269,904

The parties disagree about the meaning of the follow terms and phrases found in Claim 1 and

Claim 15 of US Patent No. 6,269,904 ("'904 Patent"): "beam;" "suspended;" "truss;" "trolley;"

"angle brackets;" "generally horizontal web;" and "transmitting." Claim 1 states:

> A fall protection system comprising at least two spaced apart support members, a
> rigid rail assembly mounted to said support members to be positioned over a work
> area, a **trolley** slideable along said rail assembly, a lanyard **suspended** from said
> **trolley**, and a harness connected to an end of said lanyard and adapted to be worn by
> a worker;
>
> said support members being spaced at least 10 feet apart and supporting said rail
> assembly above a structure to be traversed;
>
> said rail assembly including a **truss** member **suspended** from said support members
> and a **beam suspended** from said **truss** member; said **truss** member including a **truss**
> frame having a first frame member and a second frame member; said first and second

1

frame members extending generally horizontally substantially the full length of said beam and being horizontally spaced apart from each other and spaced vertically above said **beam**; said **truss** including a plurality of connecting members extending between said first and second frame members; said **beam** having a **generally horizontal web** and defining a track; said **trolley** being slideable along said track; said rail assembly being capable of arresting a workers fall with substantially no deflection of the rail assembly; the rail assembly **transmitting** the forces from the worker's fall to the support members, and applying substantially vertical forces to the support members.

('904 Patent, Hr'g Ex. 5 at Col. 6, ll. 30-56) (emphasis added). Claim 15 states:

A fall protection system comprising at least two spaced apart support members extending at least partly over a structure to be traversed by a worker, a rail assembly mounted to said support members to be positioned over the structure, a **trolley** slideable along said rail assembly, a lanyard **suspended** from said **trolley**, and a harness connected to an end of said lanyard and adapted to be worn by the worker;

said support members being spaced at least 10 feet apart and supporting said rail assembly above the structure to be traversed; said rail assembly including a **truss** member mounted to the support members and a **beam** mounted to an underside of said **truss** member; said **truss** member extending substantially the full length of said **beam**; said **beam** having a **generally horizontal web**; said **trolley** being slideable along said horizontal web;

said **truss** member including:

a first and a second horizontally spaced apart frame members spaced above said beam; said frame members comprising **angle brackets** having a first generally horizontal leg and a second leg depending from said first leg; said first and second legs defining an angle of less than about 90°;

a first set of connecting members extending between said first and second frame members and being fixed to said first legs of said frame members, said connecting members zigzagging between said first and second frame members to define a plurality of triangles;

a second set of connecting members having a first end fixed to said first frame member second leg and a second end operatively connected to said **beam**; said second set of connecting members zigzagging between said first frame member and said **beam** to define a plurality of triangles; and

a third set of connecting members having a first end fixed to said second frame member second leg and a second end operatively connected to said **beam**; said third set of connecting members zigzagging between said second frame member and said **beam** to define a plurality of triangles;

said **truss** being capable of withstanding the sudden impact of a worker's fall with substantially no deflection of the truss; the **truss** t**ransmitting** the forces from the worker's fall to the support members, and applying the forces to the support members substantially vertically.

(Id. at Col. 8, ll. 4-52) (emphasis added).

An infringement analysis contains two steps. The first step is determining the meaning and scope of the patent's claims.  See Markman v. Westview Inst. Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc) aff'd 517 U.S. 370 (1996). The second step is comparing the construed claims to the infringing device. Id. Claim construction is a matter of law reserved for the courts. Markman, 517 U.S. at 387.

When determining the correct claim construction, the Court follows the "bedrock principle" that the "claims of a patent define the invention" that the patentee owns. Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).  As such, the Court may neither add nor subtract words from the claims while construing them. Id.; TechSearch, L.L.C. v. Intel Corp., 286 F.3d 1360, 1373 (Fed. Cir. 2002). The words in the claim are "generally given their ordinary and customary meaning." Phillips, 415 F.3d at 1312 (citing Vitronics Corp. v. Conceptronics, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The ordinary and customary meaning is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1313. The patentee, however, may "act as his own lexicographer" and give terms a meaning other than their ordinary meaning, so long as the special definition is "clearly stated in the patent specification or the file history." Vitronics, 90 F.3d 1582 (citing Hoechst Celanese Corp. v. BP Chems. Ltd., 78 F.3d 1575, 1578 (Fed. Cir. 1996)).

When engaging in claim construction, the Court first looks to the "intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." Vitronics, 90 F.3d at 1582. The claims themselves provide "substantial guidance as to the

meaning of particular claim terms." <u>Phillips</u>, 415 F.3d at 1314. Context, for example, can provide important clues about the meaning of certain words within the claim. <u>See</u> <u>id.</u> (explaining that term "'steel baffles' . . . strongly implies that the term 'baffles' does not inherently mean objects made of steel."). Similarly, because terms are "normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in another claim." <u>Id.</u> Differences among the claims can be useful because "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." <u>Id.</u> at 1314-15.

Because claims are part of a "fully integrated written instrument," they must "be read in view of the specification, of which they are a part." <u>Markman</u>, 52 F.3d at 978-79. The Federal Circuit has emphasized repeatedly that the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." <u>Phillips</u>, 415 F.3d at 1315 (quoting <u>Vitronics</u>, 90 F.3d at 1582). The Court must not, however, import limitations from the specification into the claim. <u>Phillips</u>, 415 F.3d at 1323. Rather, claim terms take on their ordinary and customary meaning "unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." <u>Teleflex, Inc. v. Ficosa N. Am. Corp.</u>, 299 F.3d 1313, 1327 (Fed. Cir. 2002). Thus, the Court must interpret the claims in light of the specification, but avoid impermissibly importing limitations from the specification into the claims. <u>Comark Communications, Inc. v. Harris Corp.</u>, 156 F.3d 1182, 1186 (Fed. Cir. 1998).

The Federal Circuit has instructed that the Court "should also consider the patent's prosecution history, if it is in evidence." <u>Phillips</u>, 415 F.3d at 1317 (quoting <u>Markman</u>, 52 F.3d at

980). The prosecution history consists of "the complete record of the proceedings before the PTO [Patent Trade Office] and includes the prior art cited during the examination of the patent." Phillips, 415 F.3d at 1317. The prosecution history has value because it "provides evidence of how the PTO and the inventor understood the patent." Id. The prosecution history can clarify the meaning of the claim terms by demonstrating how the inventor understood his invention and "whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id.; see Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005). Because the patent history reflects the ongoing negotiations between the PTO and the inventor, it "often lacks the clarity of the specification and thus is less useful for claim construction purposes." Phillips, 415 F.3d at 1317.

The Court also may look to extrinsic evidence, such as expert testimony, dictionaries, and learned treatises. MBO Labs., Inc. v. Becton, Dickinson & Co., 474 F.3d 1323, 1329 (Fed. Cir. 2007). This evidence, however, is "less significant than the intrinsic record in determining the legally operative meaning of claim language." Phillips, 415 F.3d at 1317. A Court may use a dictionary to understand the ordinary meaning of claim terms "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1305 (Fed. Cir. 2005) (quoting Phillips, 415 F.3d at 1317).

Additionally, expert testimony can provide background on the technology at issue, explain how an invention works, ensure that the Court's understanding of the patent's technical aspects comports with a person of ordinary skill in the art, and establish that a particular term has a particular meaning in the pertinent field. Phillips, 415 F.3d at 1318. The Court, however, should put no stock in either conclusory, unsupported assertions by experts about the definition of a claim term or

testimony clearly at odds with the claim construction mandated by the intrinsic evidence. Id. (citing Key Pharms. v. Hercon Labs. Corp., 161 F.3d 709, 716 (Fed. Cir. 1998). Expert opinions can be unreliable because they are generated during litigation, meaning they "can suffer from bias that is not present in intrinsic evidence." Phillips, 415 F.3d at 1318. This bias is exacerbated if the expert's opinion "is offered in a form that is not subject to cross-examination." Id.

### 1. "Beam"

Plaintiff defines "beam" as "a member loaded perpendicular to its longitudinal axis which carries the loads primarily in bending." (Pl.'s Br., Doc. No. 28 at p. 7). Defendants define it as "I-Beam." (Resp., Doc. No. 37 at pp. 10-11). Defendants contend that the repeated references to "I-beam" throughout the specification warrants such a construction. They also assert that the disclosure dedication doctrine prevents Plaintiff from claiming anything other than an I-Beam because the specification states that "[t]he I-Beam can be replaced simply with a flange." ('904 Patent at Col. 6, ll. 16-18). Finally, they allege that the prosecution history supports their position.

Upon consideration, the Court will not adopt Defendants' definition because it "will not at any time import limitations from the specifications into the claims." Stumbo v. Eastman Outdoors, Inc., 508 F.3d 1358, 1362 (Fed. Cir. 2007) (quoting CollegeNet, Inc. v. ApplyYourself, Inc., 418 F.3d 1225, 1231 (Fed. Cir. 2005)). Defendants' definition, however, attempts to do just that. While the specification clearly describes the preferred embodiment as employing an I-Beam, it states that this embodiment is "by way of example and not by way of limitation." ('904 Patent at Col. 3, l. 46). It later states that "all matter contained in the above description or shown in the accompanying drawings shall be interpreted as illustrative and not in a limiting sense." (Id. at Col. 6, ll. 9-11). The Federal Circuit has refused to import limitations from the specification when nearly identical language is used. See Pfizer, Inc. v. Ranbaxy Labs. Ltd., 457 F.3d 1284, 1290 (Fed. Cir. 2006). Additionally,

the specification provides an alternative construction using just a flange, which suggests that "beam" has a broader meaning than I-beam. (Id. at Col. 6, ll. 16-18). Finally, the prosecution history Defendants reference does not suggest that the inventor and the PTO believed that beam meant only an I-beam. (Resp. at Ex. G p. 7).

Similarly, Defendants' disclosure dedication doctrine argument is without merit because the term "beam" encompasses the term "flange." Defendants also assert that the phrase "defining a track" requires the beam to have a lower flange, meaning it must be an I-Beam. While Defendant is correct that the claim does require that the beam must have a "generally horizontal web" and must "define a track," these parameters do not limit the claim to just an I-beam. This result is confirmed by dependant Claim 10, which specifically claims an I-Beam. ('904 Patent at Col. 7, ll. 31-37); see Phillips, 415 F.3d at 1314-15.

Although "generally horizontal web" and "defining a track" limit the possible beam configurations that can be used, neither the patent nor the prosecution history specifically defines beam. Therefore, the Court will look to the extrinsic evidence. Plaintiff's expert Dr. Bijan Mohraz testified that in engineering "beam" is defined as "a member loaded perpendicular to its longitudinal axis which carries the loads primarily in bending." The Court will combine this general definition of beam with the two limitations previously mentioned.

As such, the word "beam" is defined as "a member loaded perpendicular to its longitudinal axis which carries the loads primarily in bending having a generally horizontal web and defining a track."[1]

## 2.     "Generally Horizontal Web"

---

[1]The Court assumes that the parties have already agreed on the meaning of the phrase "defining a track."

Plaintiff defines "generally horizontal web" as a "web that is horizontal, but need not be precisely horizontal." (Pl.'s Br. at p. 8). Defendants define it as "a structural portion extending horizontally from the bottom edge of the I-Beam." (Resp. at p. 13).

The terms "web" and "flange" are used inconsistently throughout the '904 Patent. The specification states that the beam has a "bottom, generally horizontal flange **16**, a vertical web **17** extending upwardly from the flange" but later states that the trolley is "slideable along the flange **17**." ('904 Patent at Col. 4, ll. 16-20). The claim, however, states that the beam has a "generally horizontal web" that defines the track for the trolley to slide across. (Id. at Col. 6, ll. 49-51; Col. 8, ll. 19-21). Moreover, the figures and specification show that the trolley slides along a flange. (Id. at Fig. 1-3).

Due to this confusion, the Court looks to the extrinsic evidence to determine how the terms "flange" and "web" are used in the art normally. Plaintiff's expert testified that in engineering, "flange" always describes the horizontal portions of a beam, such as numbers 16 and 18 in the '904 patent. (Id. at Fig. 3). Similarly, "web" always refers to the vertical portion of beam, such as number 17 in the '904 patent. (Id.). He explained that the phrase "horizontal web" was an oxymoron because a web can never be horizontal. Rather, a web can only be placed in the horizontal position.

Upon consideration, the Court finds that neither Plaintiff's nor Defendants' proposed definitions is acceptable. Plaintiff's definition fails to resolve the confusion caused by the inconsistent use of "web" and "flange" in the '904 Patent. Defendants' definition improperly attempts to limit "beam" to meaning only an I-beam. While the phrase "generally horizontal web," does impose a limit on the possible types of beams that can be used, it does not require that the beam must be an I-beam. Phillips, 415 F.3d at 1314 (noting the importance of context when interpreting a patent). As Plaintiff's expert pointed out, other beam configurations satisfy the parameters of the '904 Patent.

After considering the intrinsic and extrinsic evidence, the Court defines "generally horizontal web" as "a flange that is horizontal, but not precisely horizontal." If the Court found that "generally horizontal web" did not refer to a flange, such as number 16, then the preferred embodiment would be excluded from the claim. See Oatey Co. v. IPS Corp., 514 F.3d 1271, 1276 (Fed. Cir. 2008) (holding court should not construe claim to exclude preferred embodiment). Secondly, the patent's context requires that "horizontal web" actually describes a "flange" because the claim language only makes sense to a person of ordinary skill in the art if "horizontal web" actually described a flange. Finally, the flange "is horizontal, but not precisely horizontal" because "generally" implies a lack precision or perfection.

As such, the phrase "generally horizontal web" is defined as "a flange that is horizontal, but not precisely horizontal."

### 3. "Trolley"

Plaintiff defines "trolley" as "a device with wheels that moves along a track or a smooth surface." (Pl.'s Br. at p. 9). Defendants define it as "a member movably suspended (located below and hanging) from each portion of the horizontal web of the I-beam." (Resp. at p. 12). Defendants believe the specification supports their interpretation. The specification states that "a primary object of the present invention is to provide an I-beam style trolley fall protection system." ('904 Patent at Col. 2, ll. 18-19). The '904 Patent's background section notes that "[t]he typical I-beam style fall protection system includes . . . a trolley which rides on the I-beam . . . . The trolley in the I-beam system is typically a four-wheeled device that is designed to ride on the lower leg or flange of the I-beam." (Id. at Col. 1., ll. 56-61).

Upon consideration, the Court rejects Defendants' proposed definition. First, the Court cannot use Defendants' definition because it tries, in a backdoor manner, to define "beam" as "I-

Beam." Secondly, Defendants' proposed language of "located below and hanging from" is incongruous with the claim language. Claim 1 states that the trolley is "slideable along said track" and "slideable along said rail assembly." (Id. at Col. 6, ll. 50-51, 32-33). This language does not imply that the trolley is located below or hanging from the beam. Moreover, the specification does not reflect an intent to limit the invention. See Phillips, 415 F.3d at 1323.

The Court, however, will not adopt Plaintiff's definition because the language "or smooth surface" is an unwarranted departure from the claim language. Additionally, the term "wheels" does not need to be included in the definition. Although the specification discusses trolleys that roll, the specification is not to be read "in the limiting sense." ('904 Patent at Col. 6, ll. 11, 18). The Court finds that the proper definition is "a device that slides along the track of the beam." This definition reflects the claim language that the  trolley is "slideable" and moves along "the track" without importing unnecessary limitations.

As such, "trolley" is defined as "a device that slides along the track of the beam."

### 4.  "Suspended"

Plaintiff defines "suspended" as "to hang free so as to be free on all sides except at the point of support." (Pl.'s Br. at p. 9). Defendants define it as "located below and hanging from." (Resp. at pp. 16-18). Plaintiff asserts that its definition represents the ordinary meaning of "suspended" and that Defendants' definition improperly imports limitations from the specification. Defendants assert that Claim 1 only uses "suspended" to refer to an object hanging below another object. They also assert that use of "supported" and "suspended" in the specification suggests that the two are not synonymous.

Upon consideration, the Court adopts Defendants' definition. In Claim 1, "suspended" is always used with the preposition "from," implying that the object being suspended is located below,

not above, the object suspending it. (Id. at Col. 6, ll. 33, 39-40). Additionally, the specification uses "suspended" to describe a member or device that is hanging from and locating below another member or device. (Id. at Col. 2, l. 44; Col. 3, l. 15; Col. 4, l. 10; Col. 5, ll. 8, 29; Col. 6, ll.19). The specification does talk about the possibility that the rail assembly "can be suspended above a rail car, . . . by a structure which spans multiple rail road tracks." (Id. at Col. 6, ll. 24-25). This use, however, still discusses a situation where the rail assembly is suspended below a structure. Finally, the specification discusses an alternative embodiment where the rail assembly is "supported by" braces extending from a wall. (Id. at Col. 6, ll. 19-23). This language suggests that the braces are beneath the rail assembly, meaning that the term "supported" refers to objects that are located above and sitting on a supporting structure or device. It also implies that "suspended" has a different meaning. As such, the specification "expresses a clear intention to limit the claim scope." Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1117 (Fed. Cir. 2004).

As such, "suspend" is defined as "located below and hanging from."

### 5. "Angle Brackets"

Claim 15 states that "said frame members comprising angle brackets having a first generally horizontal leg and a second leg depending from the first leg." ('904 Patent at Col. 8, ll. 24-27). Plaintiff defines angle brackets as "a device that connects the horizontal members to the truss." (Pl.'s Br. at p. 9). Defendants define it as "the angle brackets allow connecting members to be fixed to a substantial width of a leg of the L-shaped cross-section." (Resp. at p. 21).

In the prosecution history, the patentee attempted to overcome a prior art reference that used point contact by stating "[t]he use of angle brackets allows for the connecting members to be fixed to the legs of the angle brackets over a substantial width of the angle bracket leg." (Hr'g Ex. 6 at Am.

11

A p. 18). As such, the patentee disclaimed the use of a point contact connection, meaning any definition that includes the use of point contact is improper. See Chimie, 402 F.3d at 1384.

Upon consideration, the Court finds that neither party's definition is acceptable. Defendants' definition is confusing and fails to describe the angle brackets' true function. The horizontal members are comprised of angle brackets. These angle brackets are attached to the connecting members. ('904 Patent at Col. 8, ll. 23-46). A substantial width of the angle bracket leg must be fixed to the connecting and cross-members, not an "L-shaped cross section." (Hr'g Ex. 6 at Amendment A, p. 18). Plaintiff's definition is inadequate because it fails to include the substantial width requirement. Moreover, it seemingly indicates that the angle brackets are not part of the frame members, which is incorrect. ('904 Patent at Fig. 2-3; Col. 35-43).

As such, angle bracket is defined as "an element of the frame member having a first generally horizontal leg and a second leg depending from the first leg; said legs defining an angle of less than ninety degrees; and said legs being fixed to the connecting members by a substantial width of said leg."

**6.    "Truss"**

Plaintiff defines "truss" as "a rigid framework designed to support a structure." (Reply at p. 13). Defendants define it as "a structural frame having an inverted triangular end elevation." (Resp. at p. 19). Defendants assert that the specification's discussion of the advantages of the triangular truss, as well as the repeated references to it, require the adoption of their proposed definition.

The disclosure states that the invention overcomes the prior problems of an I-Beam system because "the truss **15** reinforces the I-Beam **13** to enable the I-beam to span substantial lengths without the need for numerous or frequent supports." ('904 Patent at Col. 5, ll. 51-53). The

specification later states that "although a triangular truss is shown, the truss can be made into other shapes." (Id. at col. 6, ll. 11-13).

Upon consideration, the Court adopts Plaintiff's definition because limiting the truss shape to a triangle would import improperly the preferred embodiment's limitations into Claim 1. See Stumbo, 508 F.3d at 1362. Moreover, the specification states that other truss shapes can be made and that it is "illustrative and not in a limiting sense." ('904 Patent at Col. 6, l. 11); See Pfizer, 457 F.3d at 1290. Dependent Claim 7, which specifically claims a triangular shaped truss, supports this interpretation. See Phillips, 415 F.3d at 1314-15. Finally, the Court will not limit the definition of truss member due to Claim 15, which suggests that the truss must be constructed in a way only yields a triangular shape. ('904 Patent at Col. 8, ll. 23-28). The Court will not impose this limitation because Claim 1 uses general terms, whereas Claim 15 specifies a certain numerical range. The Federal Circuit has instructed that "when a claim term is expressed in general descriptive words, we will not ordinarily limit the term to a numerical range that may appear in the written description or in other claims." Conoco, Inc. v. Energy & Envtl Int'l, L.C., 460 F.3d 1349, 1358 (Fed. Cir. 2006).

As such, "truss" is defined as "a rigid framework designed to support a structure."

### 7.    "Transmitting"

Plaintiff defines "transmitting" as "the conveyance or transfer of force or energy through a single member or a series of connected members." (Pl.'s Br. at p. 9). Defendants define it as "to pass by physical contact." (Resp. at p. 20). The specification states that when a worker falls, the load is "transferred to the supports." ('904 Patent at Col. 6, ll. 1-3). In the claims, the patent refers to "transmitting" the forces from the worker's fall. (Id. at Col. 6, l. 53; Col. 8, l. 49). Therefore, it appears that the word "transmitting," as used in the patent, at minimum refers to the transfer of forces.

Defendants, however, assert that any definition must include the term "physical." Upon consideration, the Court disagrees. Although the force being transmitted must originate from an exertion of a physical force, i.e. the worker falling, the term "physical" may improperly limit the patent's scope. Specifically, it could imply that a force can only pass through two abutting objects. Claim 1, however, states that the rail assembly transmits the forces to the support members. (Id. at Col. 6, ll. 53-54). Such a transmission requires the force to move through portions of the invention not abutting one another. As such, the Court will adopt Plaintiff's definition because it accurately reflects how the force of a worker's fall moves through the invention.

As such, "transmitting" is defined as "the conveyance or transfer of force or energy through a single member or a series of connected members."

## II.    US Patent No. D440,023

US Patent No. D440,023 ("'023 Patent") is a design patent. Plaintiffs offer the following construction: "A fall protection system having a track defining beam suspended from a truss, the truss being triangular in end elevation." (Pls.' Br. at p. 11). Alternatively Defendants have offered the following construction:

> The '023 Patent claim covers the ornamental design for a truss-style trolley beam for a fall protection system as shown and described by solid lines in the four drawings of the '023 Patent. The '023 Patent design includes a top rectangular bar having a flat top surface and a flat bottom surface. Attached to the top surface of each end of the top rectangular bar is a flat connecting member having a rounded angle portion and forming an angle slightly less than ninety degrees. The opposite end of each connecting member is attached to an inside surface of a side member. Each side member is formed from a rod having a round cross section. Each side member has a lengthwise zigzag shape. The end elevational shape of the top rectangular bar and two side members is generally an inverted triangle with rounded upper corners and a flattened lower point. The connecting members attach to points on the uppermost portions of the zigzag side members. The lowermost ends of the zigzag side members attach to the upper surface of the upper horizontal flange of an I-beam. The I-beam is suspended from and below the side members. The I-beam has a flat central vertical portion. Attached to the top of the vertical portion of the I-beam is an upper horizontal flange. The upper horizontal flange extends an equal distance from each

side of the vertical portion. Each inside surface of the upper horizontal flange slants downwardly toward the vertical portion. Attached to the bottom of the vertical portion of the I-beam is a lower horizontal flange. The lower horizontal flange extends an equal distance from each side of the vertical portion. Each inside surface of the lower horizontal flange slants upwardly toward the vertical portion.

(Resp. at p. 26).

Design patents have "almost no scope" and are "limited to what is shown in the application drawings." In re Mann, 861 F.2d 1581, 1582 (Fed. Cir. 1998). Determining whether a design patent is infringed requires (1) construction of the patent claim, and (2) comparison of the construed claim to the accused patent. Elmer v. ICC Fabricating, Inc., 67 F.3d 1571, 1577 (Fed. Cir. 1995). As with utility patents, claim construction is a question of law. See Unidynamics Corp. v. Automatic Prods. Int'l, Ltd., 157 F.3d 1311, 1316-17 (Fed. Cir. 1998). Claim construction in a design patent requires "an additional level of abstraction" because the Court is only presented with visual depictions. Durling v. Spectrum Furniture Co., 101 F.3d 100, 103 (Fed. Cir. 1996). As such, the Court must translate the visual depictions into words. Id. In construing a design patent, the scope of the claimed design "encompasses 'its visual appearance as a whole' and in particular 'the visual impression it creates." Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) (quoting Durling, 101 F.3d at 104-05). Because patent law only protects the ornamental features of a design, the Court must describe a design patent in a way that includes all the ornamental features. OddzOn Prods., Inc. v. Just Toys, Inc., 122 F.3d 1396, 1404 (Fed. Cir. 1997); Elmer, 67 F.3d at 1578 (holding focus is on the overall ornamental features of the design).

Upon consideration, the Court will not adopt Plaintiff's proposed construction because it is overly broad. Plaintiff's construction falls to describe accurately all of the design features, such as the shape of triangular end elevation, the zigzag pattern of the connecting members, and the type of beam used. Defendants' proposed construction is inadequate because it is too narrow. It attempts to include

descriptions and requirements that are not necessary to provide the design's "visual appearance as a whole." Contessa, 282 F.3d at 1376.

As such, the Court will adopt the following construction, which it believes describes the design in sufficient detail without improper limitations through the use of extraneous detail:

> The '023 Patent claim covers the ornamental design for a truss-style trolley beam for a fall protection system as shown and described by solid lines in the four drawings of the '023 Patent. The '023 Patent design includes a top rectangular bar with flat surfaces. Attached to the top surface of the rectangular bar at each end is the horizontal leg of a curved member whose legs form an angle of less than ninety degrees. The opposite leg of each curved member is attached to an inside surface of a connecting member. Each connecting member is formed from a rod having a round cross section and has a lengthwise zigzag shape. The end elevational shape of the top rectangular bar and the connecting members is an inverted triangle with rounded upper corners and a flattened lower point. The curved members attach to points on the uppermost portions of the zigzag connecting members. A diagonally placed cross member extends between the curved members. The lowermost ends of the connecting members attach to the upper flange of an I-beam. The I-beam is suspended from and below the curved members and has symmetrical flanges.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the disputed terms in US Patent No. 6,269,904 and the disputed claim construction in US Patent No. D440,023 will be construed as set forth in this Memorandum and Order.

Dated this 7th day of April, 2008.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE